William Shipp Daniel, Esquire (Fed. ID No. 14340)
**PARHAM LAW FIRM, LLC**
541 W Evans Street
Florence, South Carolina 29591
T: 843.407.7757
E: shipp@parhamlawllc.com
*Local Counsel for Plaintiff*

Michael T. Ashley, Esquire (pro hac vice application forthcoming)
**ASHLEY LAW, A LIMITED LIABILITY COMPANY**
Robert Treat Center
50 Park Place, Suite 1400
Newark, New Jersey 07102
T: 973.623.0501 F: 973.623.0329
E: ashleylaw@ashley-law.com
New Jersey Attorney ID No. 270032021
*Attorneys for Plaintiff Randy Brown*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**CHARLESTON DIVISION**

| | |
|---|---|
| RANDY BROWN,<br><br>Plaintiff,<br><br>v.<br><br>ST. JOHN'S FIRE DISTRICT and RYAN KUNITZER, individually,<br><br>Defendants. | Civil Action No. ___________________<br><br>**COMPLAINT AND DEMAND FOR TRIAL BY JURY**<br><br>JURY TRIAL DEMANDED |

Plaintiff Randy Brown ("Plaintiff" or "Brown"), residing in the Town of Moncks Corner, County of Berkeley, State of South Carolina, by and through his undersigned counsel, hereby alleges and complains against Defendants St. John's Fire District (the "District") and Ryan Kunitzer ("Chief Kunitzer," and together with the District, "Defendants") as follows:

## PRELIMINARY STATEMENT

1. This is an action to redress race discrimination and retaliation in public employment in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* ("Title VII"), and the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, as enforced through the Civil Rights Act of 1871, 42 U.S.C. § 1983.

2. Plaintiff, an African American firefighter who has served the District for more than seventeen years, discovered a noose — among the most recognizable instruments and symbols of racial terror in American history — tied around the neck of a dark-skinned training mannequin inside his own fire station.

3. Plaintiff reported the noose immediately. The District never identified or disciplined the person responsible, never acknowledged to its workforce that the conduct had occurred, and left a material investigative lead unpursued. Instead, the District turned its investigation on Plaintiff, demanding that the target of the noose submit to a law-enforcement polygraph examination as though he were the suspect.

4. On June 25, 2026, the United States Equal Employment Opportunity Commission ("EEOC") transmitted its Determination and Notice of Rights on Plaintiff's charge of race discrimination against the District, identifying Chief Kunitzer as a copy recipient. The very next day, June 26, 2026, Chief Kunitzer wrote directly to Plaintiff, branded him as having "declined to cooperate," declared the District's investigation exhausted, and closed the matter.

5. Plaintiff seeks compensatory damages, punitive damages against Chief Kunitzer individually, declaratory and injunctive relief, and attorneys' fees and costs, as set forth more fully below.

## JURISDICTION AND VENUE

6. This Court has original jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3)–(4) and 42 U.S.C. § 2000e-5(f)(3), because the causes of action pleaded herein arise under the Constitution and laws of the United States, specifically Title VII, 42 U.S.C. § 1983, and the Fourteenth Amendment to the United States Constitution.

7. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1) and (b)(2) and 42 U.S.C. § 2000e-5(f)(3), because each Defendant resides in this District, all of the events and omissions giving rise to these claims occurred in this District, the employment records relevant to the unlawful employment practices alleged are maintained and administered in this District, and Plaintiff is employed in this District.

8. Pursuant to Local Civil Rule 3.01 (D.S.C.), the undersigned certifies that this action is properly assignable to the Charleston Division, because the District is located and does business in Charleston County, Chief Kunitzer performs his official duties in Charleston County, and a substantial part of the events and omissions giving rise to the claims occurred in Charleston County.

## ADMINISTRATIVE EXHAUSTION AND CONDITIONS PRECEDENT

9. On June 18, 2026, Plaintiff signed and presented to the EEOC a Charge of Discrimination against the District, designated EEOC Charge No. 415-2026-00275 (the "Charge"), alleging that the District discriminated against him because of his race in violation of Title VII. The Charge described the September 12, 2025 noose and the District's failure to address it with its workforce, and requested that it be filed with both the EEOC and any state or local agency.

10. The Charge was filed within three hundred (300) days of September 12, 2025.

11. The EEOC dismissed the Charge and issued a Determination and Notice of Rights (the “Notice”), which was digitally signed by the EEOC’s Director on June 25, 2026 and transmitted by electronic mail to Plaintiff and to his counsel on June 25, 2026. Plaintiff received the Notice on June 25, 2026. The Notice states that the dismissal “does not mean the claims have no merit.”

12. This action is commenced within ninety (90) days of Plaintiff’s receipt of the Notice.

13. The retaliatory conduct alleged herein, including the District’s June 26, 2026 closure of its investigation, occurred after the Charge was filed, grew out of the Charge, and is reasonably related to the discrimination described in the Charge and to the investigation that could reasonably be expected to follow from it.

14. Plaintiff’s claims under 42 U.S.C. § 1983 are not subject to any administrative exhaustion requirement.

15. All conditions precedent to the institution of this action have been satisfied.

**PARTIES**

16. Plaintiff is an African American citizen of the United States who resides in the Town of Moncks Corner, Berkeley County, South Carolina. Plaintiff has been employed by the District as a firefighter since on or about March 31, 2008, and remains so employed.

17. Upon information and belief, Plaintiff is one of very few African American firefighters employed by the District.

18. Defendant St. John’s Fire District is a special purpose district and political subdivision of the State of South Carolina, organized in 1959 pursuant to Act No. 369, with its principal offices at 1148 Main Road, Johns Island, South Carolina 29455. The District provides

fire, rescue, and emergency medical services to Johns Island, Wadmalaw Island, Kiawah Island, and Seabrook Island in Charleston County, South Carolina.

19. The District is a "person" within the meaning of 42 U.S.C. § 1983 and an "employer" within the meaning of 42 U.S.C. § 2000e(b). Upon information and belief, the District has employed more than one hundred employees in each of twenty or more calendar weeks in the current and preceding calendar years.

20. The District is governed by the St. John's Fire District Commission (the "Commission"), whose members are appointed by the Governor upon the recommendation of the Charleston County Council, and which is responsible for the oversight of all administrative and operational aspects of the District.

21. Defendant Ryan Kunitzer is, and at all relevant times was, the Fire Chief of the District and the Commission's staff liaison. Upon information and belief, the Commission has delegated to the Fire Chief final authority over the District's personnel matters, including the investigation of complaints of workplace harassment, the imposition of discipline, and official communications to the District's workforce. Chief Kunitzer exercised that authority in directing and closing the investigation described herein.

22. Chief Kunitzer is sued in his individual capacity. At all relevant times, Chief Kunitzer acted under color of state law and within the scope of his employment with the District. Upon information and belief, Chief Kunitzer resides in the State of South Carolina.

23. At all relevant times, the District acted through its commissioners, officers, agents, and employees, each of whom acted under color of state law.

## STATEMENT OF FACTS

**A. Plaintiff's Employment.**

24. The District hired Plaintiff as a firefighter on or about March 31, 2008. Plaintiff has devoted more than seventeen years of his career to protecting the residents of the island communities the District serves.

**B. The September 12, 2025 Noose.**

25. On September 12, 2025, Plaintiff discovered, inside his assigned District fire station, a noose tied around the neck of a dark-skinned cardiopulmonary resuscitation ("CPR") training mannequin.

26. The CPR mannequin is District property maintained at the station for the training of District personnel. Upon information and belief, the area of the station in which the mannequin was kept is accessible to District personnel and is not open to the general public.

27. The noose was discovered immediately after another District crew had manned Plaintiff's station while Plaintiff's crew was out of the facility. The District has acknowledged this sequence of events in writing.

28. Plaintiff identified members of that crew as the suspected source of the conduct.

29. A noose tied around the neck of a dark-skinned human figure is an unmistakable depiction of the lynching of a Black person. Displayed inside a fire station in which Plaintiff is, upon information and belief, one of very few Black firefighters, it communicated a racial threat directed at Plaintiff and at the District's other African American personnel.

30. The display was unwelcome to Plaintiff and was motivated by race.

**C. Plaintiff's Report and His Request for Acknowledgment.**

31. Plaintiff immediately reported the noose to his Captain, Jered Michael, and to Battalion Chief Nate Adams, and provided a statement in connection with the District's inquiry.

32. Plaintiff specifically asked the Fire Chief to issue a department-wide communication acknowledging what had happened and making clear that such behavior is unacceptable.

33. Plaintiff did not seek the termination of any employee. The District has acknowledged in writing that Plaintiff "did not want anyone to lose their job but wanted an apology."

34. The District never issued the department-wide acknowledgment Plaintiff requested, and no communication was made to the District's workforce to address the seriousness of the noose or to reassure Plaintiff or others that steps were being taken to prevent a recurrence.

35. On November 10, 2025, Chief Kunitzer did send a department-wide e-mail to the District's workforce. That message addressed mental health and the importance of supporting one another after a firefighter from another department died by suicide. It said nothing about the noose.

36. Chief Kunitzer thus had both the means and the demonstrated willingness to address the entire workforce on matters of workplace well-being, but chose not to address the racial threat displayed in one of his own stations.

**D. The Commission Is Briefed and Remains Silent.**

37. On October 13, 2025, approximately one month after the noose was discovered, the Commission held its regular public meeting. Chief Kunitzer, Battalion Chief Adams, the District's Human Resources Manager, and the District's attorney attended.

38. According to the Commission's published minutes, Chief Kunitzer's report addressed new hires, recruit graduations, promotions, professional credentials, mold remediation at a station, a fire-prevention event, and new equipment. The report did not mention the noose, the District's investigation, or any remedial measure. The Human Resources Committee reported nothing.

39. At the same meeting, the District's attorney advised that there were "a couple of personnel matters" on which she requested an executive session, and the Commission voted unanimously to enter executive session to discuss personnel matters.

40. Upon information and belief, the noose and the District's investigation of it were among the personnel matters presented to the Commission in executive session, and the Commission therefore had actual knowledge of the noose no later than October 13, 2025.

41. Upon information and belief, the Commission never publicly addressed the noose, never directed that the District's workforce be informed that the conduct had occurred and would not be tolerated, and never adopted any policy or measure in response to it.

## E. The Investigation Stalls and Is Turned on the Victim.

42. The District conducted internal inquiries, which did not identify the person responsible for the noose.

43. The District then retained outside counsel to interview District employees. That effort also did not identify the person responsible.

44. The District then engaged the Charleston County Sheriff's Office to conduct polygraph examinations of members of the crew that Plaintiff had identified as the suspected source of the conduct. By the District's own account, the results of those examinations were "inconclusive."

45. Upon information and belief, the polygraph examination of firefighter Joseph Crawford ("Crawford"), a member of the crew Plaintiff identified, returned an inconclusive result. Upon information and belief, the District did not pursue that open investigative lead.

46. Upon information and belief, not every member of the shifts at issue was examined, notwithstanding the District's representation that all known witnesses on the suspected shift had been examined.

47. On March 17, 2026, Plaintiff, through counsel, notified Chief Kunitzer in writing that Plaintiff was represented in connection with the investigation, requested that all communications regarding the matter be directed to counsel, and demanded that the District preserve all documents, electronically stored information, photographs, reports, and other materials related to the matter.

48. On May 4, 2026, the District's general counsel responded that the Charleston County Sheriff's Department had requested to conduct "a polygraph and interview" of Plaintiff; asserted that cooperation was "mandatory for all employees, including Mr. Brown"; demanded three dates before June 1, 2026 on which Plaintiff would be available; and warned that if dates were not provided by May 15, 2026, the District would "proceed with scheduling directly with Mr. Brown."

49. The May 4, 2026 letter further described Plaintiff as "the only employee involved in any manner in the investigation who has not already complied with this requirement," and stated that the District "reserves the right to communicate directly with Mr. Brown."

50. Upon information and belief, the District's characterization of Plaintiff's submission to a police polygraph as "mandatory" was intended to convey, and did convey, that Plaintiff's refusal would be treated as a failure to comply with a job requirement.

51. On May 15, 2026, Plaintiff's counsel asked the District to identify the authority on which it relied for the position that Plaintiff's submission to a polygraph examination was mandatory.

52. On June 2, 2026, the District's outside employment counsel responded. The only authority cited was 29 U.S.C. § 2006(a), which exempts governmental employers from the general prohibition on workplace polygraph testing in the Employee Polygraph Protection Act. That provision permits a governmental employer to use a polygraph; it does not require any employee — much less the target of racial harassment — to submit to one.

53. The June 2, 2026 letter asserted that Plaintiff was "not being subjected to any questioning or measures that have not been imposed on other witnesses." But Plaintiff was not a witness to the placement of the noose. He was its target and the complainant who reported it.

54. The June 2, 2026 letter offered to issue Plaintiff a written *Garrity* warning — a protection afforded to public employees whose statements may expose them to criminal liability — before the polygraph, confirming that the District was prepared to examine Plaintiff in the manner of a suspect.

55. Upon information and belief, the District has never before required a complainant of workplace harassment to submit to a law-enforcement polygraph examination as a condition of the District's investigation of that complaint.

56. Upon information and belief, no written policy of the District requires any employee, much less a complainant, to submit to a polygraph examination.

57. The June 2, 2026 letter set a deadline of Monday, June 8, 2026, and stated that if the District did not hear from counsel by that date, the District would "move forward as it deems appropriate."

58. Plaintiff declined to submit to a police polygraph examination as the victim of the harassment, while remaining willing to cooperate fully with a good-faith investigation into the misconduct he had reported.

**F. The Charge, the June 25 Notice, and the June 26 Closure.**

59. June 8, 2026 came and went. The District did not close its investigation on that date.

60. Upon information and belief, during the more than two weeks that followed the District's own June 8, 2026 deadline, the District took no action to close its investigation and made no written communication to Plaintiff regarding it.

61. On June 18, 2026, Plaintiff signed and presented his Charge to the EEOC, alleging that the District had discriminated against him because of his race in violation of Title VII.

62. The Charge expressly identified the Fire Chief's failure to issue a department-wide communication acknowledging the noose as part of the discrimination Plaintiff alleged.

63. On June 25, 2026, the EEOC transmitted the Notice to Plaintiff and his counsel by electronic mail.

64. The Notice identifies, as a copy recipient, "Ryan Kunitzer, St. John's Fire District, 1148 Main Rd., Johns Island, SC 29455."

65. Upon information and belief, the District and Chief Kunitzer received notice of the Charge, including through the Notice, on or about June 25, 2026.

66. On June 26, 2026 — the very next day — Chief Kunitzer signed and sent a letter addressed to Plaintiff personally, rather than to his counsel, closing the District's investigation (the "Closure Letter").

67. Upon information and belief, the Closure Letter was the first written communication regarding the investigation that Chief Kunitzer directed to Plaintiff personally after Plaintiff's counsel requested, on March 17, 2026, that all such communications be directed to counsel.

68. The Closure Letter told Plaintiff, "You have declined to cooperate with that effort," and announced: "Given that you have declined to cooperate with the polygraph efforts, we believe that all reasonable efforts to investigate and identify the culprit have been exhausted. Accordingly, we will close the matter now . . . ."

69. The Closure Letter conditioned any further investigation on Plaintiff's submission to the police polygraph: "If you change your mind about cooperating with the polygraph examination, please let us know and we will arrange that."

70. The Closure Letter further stated that "other employees were not permitted to decline" the polygraph, confirming that the District treated submission to a police polygraph as a compulsory condition of employment.

71. The Closure Letter did not mention the unresolved inconclusive examination of a member of the suspected crew, and did not address Plaintiff's standing request for a department-wide acknowledgment that the conduct had occurred and would not be tolerated.

72. The timing of the Closure Letter was not a coincidence. The District allowed its own June 8, 2026 deadline to pass without closing the investigation. It closed the investigation only

after, and within one day of, receiving notice that Plaintiff had taken his complaint of race discrimination to the EEOC.

73. By closing its investigation the day after receiving that notice, and by attributing the closure to Plaintiff's supposed failure to cooperate, the District and Chief Kunitzer sought to create a written record shifting responsibility for the unremedied noose onto Plaintiff, in anticipation of the litigation the Notice authorized.

74. The Closure Letter branded Plaintiff as uncooperative in an official District communication, terminated the only process capable of identifying the person who targeted him, bypassed his counsel, and made any further investigation contingent on his submission to law-enforcement examination as though he were a suspect.

75. The District's and Chief Kunitzer's conduct in closing the investigation would dissuade a reasonable employee from making or supporting a charge of discrimination.

76. On July 14, 2026, Plaintiff's counsel responded to the Closure Letter. Counsel corrected the District's characterization of Plaintiff as uncooperative, identified the unresolved inconclusive examination of Crawford as an open lead, reiterated Plaintiff's request for a department-wide acknowledgment and for confirmation of the District's protective and remedial measures, and asked the District not to treat the matter as closed.

77. Upon information and belief, the District has not reopened its investigation.

**G. The District's Tolerance of Identity-Based Hostility by the Suspected Crew.**

78. Upon information and belief, in or about May 2026, a female firefighter employed by the District participated in a training evolution led by Crawford, who then held the position of senior engineer.

79. Upon information and belief, Crawford conducted that training in an unreasonably exhausting manner, which the female firefighter understood to be an intentional effort to cause her to quit or transfer so that personnel favored by Crawford could fill her position.

80. Upon information and belief, during the training the female firefighter's helmet came off, a ladder struck her in the head, and she fell to the ground nearly unconscious, sustaining a significant head injury.

81. Upon information and belief, Crawford declined to assist her, turned, and walked away, leaving her injured on the ground.

82. Upon information and belief, when the female firefighter reported the incident, her superior directed her to ask Crawford to prepare an incident report, and Crawford responded with words to the effect of: "No, I'm not doing an incident report. I don't do incident reports for DEI hires."

83. The term "DEI hire" is a pejorative used to demean women and racial minorities as unqualified beneficiaries of diversity, equity, and inclusion efforts.

84. Upon information and belief, the District did not discipline Crawford for abandoning an injured colleague, for refusing to document the incident, or for disparaging her as a "DEI hire."

85. Upon information and belief, the District retained Crawford in a senior position with responsibility for training other personnel, notwithstanding that he was a member of the crew suspected of the noose and that his polygraph examination was inconclusive.

86. The District's inaction toward Crawford reflects and reinforces a custom of tolerating identity-based hostility toward District employees who are not white men, and of declining to discipline the members of the crew suspected of targeting Plaintiff.

**H. Plaintiff's Injuries.**

87. As a direct and proximate result of Defendants' acts and omissions, Plaintiff has suffered and continues to suffer emotional distress, humiliation, and concern for his personal safety in the workplace.

88. Plaintiff must continue to report for duty alongside co-workers among whom, upon information and belief, remains the person who tied a noose around the neck of a dark-skinned figure in Plaintiff's station.

89. Defendants' response — refusing to acknowledge the noose to the workforce, subjecting Plaintiff to the demands of a suspect, branding him uncooperative, and closing the matter the day after receiving notice of his Charge — compounded rather than remedied the harm to Plaintiff.

## SUPPLEMENTAL FACTS CONCERNING MUNICIPAL LIABILITY

90. The Commission is the final policymaker for the District with respect to all administrative and operational matters, including personnel policy, the investigation of workplace harassment, and the discipline of District employees.

91. Upon information and belief, the Commission delegated to Chief Kunitzer final policymaking authority over the investigation and resolution of employee complaints of harassment and over communications to the District's workforce, and Chief Kunitzer's decisions on those subjects were not subject to meaningful review.

92. The decisions to demand that Plaintiff submit to a law-enforcement polygraph as a "mandatory" condition of the investigation, to refuse Plaintiff's request for a department-wide acknowledgment of the noose, and to close the investigation on June 26, 2026 were

each made or ratified by the District's final policymakers and constitute official policy of the District.

93. Upon information and belief, the District's written Personnel Manual, as most recently distributed to Plaintiff, contains no policy prohibiting racial harassment in the workplace, no procedure for reporting such harassment, no procedure for investigating it, and no protection for employees who report it, and addresses racially harassing statements only in a provision governing employees' use of District computers and communications systems.

94. Upon information and belief, the District provided anti-harassment training to its personnel only after Plaintiff retained counsel, more than six months after the noose was discovered. The District's general counsel first described that training, on May 4, 2026, as having been "recently conducted."

95. Upon information and belief, the District has not trained its officers and supervisors on how to respond to the display of racially threatening symbols, how to investigate such displays, or how to protect the employees targeted by them.

96. The District maintains a custom and practice of treating racial harassment as unsolvable, declining to acknowledge it to the workforce, declining to discipline members of the suspected crew for identity-based hostility, and shifting the burden of the investigation onto the victim.

97. The Commission had actual knowledge of the noose no later than October 13, 2025, and, upon information and belief, acquiesced in and ratified Chief Kunitzer's handling of the matter, including the polygraph demand and the June 26, 2026 closure.

98. Upon information and belief, the District has not required white employees who reported workplace misconduct to submit to law-enforcement polygraph examinations as a condition of the District's investigation of their reports.

99. The District's policymakers were deliberately indifferent to the obvious risk that their policies, customs, and failures to train would result in the continuation of a racially hostile work environment and in the violation of the constitutional rights of the District's African American employees, including Plaintiff.

100. The District's policies, customs, and practices were the moving force behind the violations of Plaintiff's rights alleged herein.

**HISTORICAL CONTEXT OF THE NOOSE**

101. Plaintiff is an African American man whose experience as a member of a racial minority in the South Carolina Lowcountry is informed by the Trans-Atlantic slave trade, the era of slavery, and the oppressive era of Jim Crow that followed.

102. The Sea Islands the District serves, including Johns Island and Wadmalaw Island, are historically home to the Gullah Geechee people, descendants of Africans enslaved on the region's plantations.

103. After Reconstruction, lynching was used across the South as a tool of racial terror to enforce the subordination of Black Americans. The Equal Justice Initiative has documented 4,075 racial terror lynchings of African Americans in twelve Southern states, including South Carolina, between 1877 and 1950.[1]

---

[1] Equal Justice Initiative, *Lynching in America: Confronting the Legacy of Racial Terror* (Montgomery, Ala.).

104. The Equal Justice Initiative has documented at least 185 such lynchings in South Carolina during that period.[2]

105. These lynchings, frequently carried out by hanging with a noose, were not only acts of brutal violence but were often staged as public spectacles, with White onlookers, including men, women, and children, gathered and photographed beside the bodies of Black victims.

106. The hangman's noose thereby became the emblem of racial terror in America. That legacy is echoed in cultural expressions such as Billie Holiday's song "Strange Fruit," which captures the haunting significance of those lynchings.

107. The impact of that history permeates American life and law, from the murder of Emmett Till in 1955 to the enactment in 2022 of the Emmett Till Antilynching Act, which made lynching a federal hate crime.[3]

108. Racial violence is not only history in the community the District serves. On June 17, 2015, a white supremacist murdered nine Black worshippers at Mother Emanuel African Methodist Episcopal Church in downtown Charleston, in the same county the District serves.

109. The EEOC has for decades recognized the display of nooses as a recurring form of racial harassment in American workplaces. As early as 2000, the Chair of the EEOC described a disturbing national trend of racial harassment cases involving hangman's nooses.[4] The EEOC has since described the noose as a longstanding symbol of violence associated with the lynching of African Americans, and has explained that such symbols are

---

[2] Equal Justice Initiative, *Lynching in America: Confronting the Legacy of Racial Terror* (3d ed. 2017).

[3] Emmett Till Antilynching Act, Pub. L. No. 117-107 (2022) (codified at 18 U.S.C. § 249(a)(5)).

[4] U.S. Equal Emp. Opportunity Comm'n, Press Release, *EEOC Chairwoman Responds to Surge of Workplace Noose Incidents at NAACP Annual Convention* (July 13, 2000).

inherently threatening and significantly alter the workplace environment for Black workers.[5]

110. For African Americans, the noose continues to evoke a reasonable and profound trauma rooted in that long history of racial terror. Tied around the neck of a dark-skinned human figure, its meaning is not ambiguous.

111. Defendants knew, or should have known, the meaning of the noose and the harm its display would inflict on Plaintiff.

**COUNT I**
**Race-Based Hostile Work Environment**
**Title VII, 42 U.S.C. § 2000e-2(a)**
**(Against the District)**

112. Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

113. Plaintiff is a member of a protected class as an African American.

114. Plaintiff was subjected to unwelcome harassment, including the display of a noose tied around the neck of a dark-skinned training mannequin in his fire station.

115. The harassment was based on Plaintiff's race.

116. The display of a noose around the neck of a dark-skinned human figure is so severe that, even on a single occasion, it altered the terms and conditions of Plaintiff's employment and created a working environment that a reasonable person in Plaintiff's position would find hostile and abusive, and that Plaintiff subjectively perceived as hostile and abusive.

[5] Statement of the EEOC's New Orleans Field Office accompanying the Commission's racial harassment action against Exxon Mobil Corporation (2023).

117. The harassment is imputable to the District. The District had actual knowledge of the harassment from the day it occurred, through Plaintiff's report to his Captain and Battalion Chief, and its Commission had actual knowledge no later than October 13, 2025.

118. The District failed to take prompt and effective remedial action reasonably calculated to end the harassment. The District never identified or disciplined the person responsible; never acknowledged the conduct to its workforce; delayed anti-harassment training for more than six months; left an inconclusive examination of a suspected crew member unpursued; retained that crew member in a senior training role without discipline for further identity-based hostility; redirected its investigation onto the victim; and closed the investigation by blaming the victim.

119. Upon information and belief, the person responsible for the noose remains employed by the District and continues to work among Plaintiff and the District's other African American personnel.

120. As a direct and proximate result of the District's acts and omissions, Plaintiff has sustained the damages hereinabove alleged.

**COUNT II**
**Retaliation**
**Title VII, 42 U.S.C. § 2000e-3(a)**
**(Against the District)**

121. Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

122. Plaintiff engaged in activity protected by Title VII, including by (a) reporting the noose to his Captain and Battalion Chief on September 12, 2025; (b) requesting a department-

wide acknowledgment that the conduct had occurred and would not be tolerated; (c) retaining counsel to pursue his complaint and, through counsel, demanding preservation of evidence on March 17, 2026; (d) through counsel, challenging on May 15, 2026 the District's demand that he submit to a police polygraph; and (e) filing the Charge with the EEOC on June 18, 2026.

123. The District knew of Plaintiff's protected activity. Among other things, the District and Chief Kunitzer received notice of the Charge, including through the Notice, on or about June 25, 2026.

124. The District took materially adverse actions against Plaintiff, including by (a) demanding, on May 4, 2026, that Plaintiff submit to a "mandatory" law-enforcement polygraph and interview as though he were a suspect, and threatening to bypass his counsel and schedule the examination directly with him; (b) on June 26, 2026, branding Plaintiff in an official District communication as having "declined to cooperate"; (c) on June 26, 2026, closing the investigation of the noose on the basis of that characterization; (d) conditioning any further investigation on Plaintiff's submission to police examination; and (e) communicating the closure directly to Plaintiff in disregard of his request that all communications be directed to his counsel.

125. These actions well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.

126. A causal connection exists between Plaintiff's protected activity and the District's materially adverse actions.

127. The District closed its investigation on June 26, 2026, one day after the EEOC transmitted the Notice identifying Chief Kunitzer as a copy recipient. The District had

allowed its own June 8, 2026 deadline to pass without closing the investigation, and, upon information and belief, took no step toward closure until it received notice of the Charge.

128. The District's May 4, 2026 polygraph demand followed within seven weeks of Plaintiff's retention of counsel and counsel's March 17, 2026 demand for preservation of evidence.

129. The District's stated reason for closing the investigation — Plaintiff's supposed failure to cooperate — is pretextual. Plaintiff reported the noose, provided a statement, and remained willing to cooperate with a good-faith investigation; the District itself left an open investigative lead unpursued; and the District had no authority compelling the victim of the harassment to submit to a police polygraph.

130. As a direct and proximate result of the District's acts and omissions, Plaintiff has sustained the damages hereinabove alleged.

**COUNT III**
**Deprivation of Equal Protection**
**42 U.S.C. § 1983**
**(Against the District — *Monell* Liability)**

131. Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

132. The District is a "person" subject to suit under 42 U.S.C. § 1983, and at all relevant times acted under color of state law.

133. The Equal Protection Clause of the Fourteenth Amendment guarantees Plaintiff, a public employee, the right to be free from intentional discrimination on the basis of race in the terms and conditions of his employment, including the right to be free from a racially hostile work environment that his public employer knowingly permits.

134. Plaintiff's right to make and enforce contracts, including his contract of employment, free from race discrimination, as secured by 42 U.S.C. § 1981, is enforceable against the District through 42 U.S.C. § 1983.

135. The District deprived Plaintiff of those rights by knowingly permitting a racially hostile work environment to persist, by refusing to acknowledge the racial threat directed at him, and by subjecting him, as a Black complainant of racial harassment, to treatment as a suspect that, upon information and belief, it has not imposed on white employees who reported workplace misconduct.

136. The deprivation of Plaintiff's rights was caused by the District's official policies, customs, and practices, including (a) the decisions of its final policymakers to demand that Plaintiff submit to a police polygraph, to refuse a department-wide acknowledgment, and to close the investigation on June 26, 2026; (b) the Commission's ratification of those decisions with actual knowledge of the noose; (c) its custom of tolerating identity-based hostility and declining to discipline members of the suspected crew; (d) its failure to adopt and enforce any policy prohibiting racial harassment and prescribing how complaints of it are to be investigated; and (e) its failure to train its officers and supervisors to respond to racially threatening displays.

137. The District's policymakers acted with deliberate indifference to the known and obvious consequence that these policies, customs, and failures would result in the violation of Plaintiff's constitutional rights.

138. The District's policies, customs, and practices were the moving force behind the violations of Plaintiff's rights.

139. As a direct and proximate result of the District's acts and omissions, Plaintiff has sustained the damages hereinabove alleged.

**COUNT IV**
**Deprivation of Equal Protection**
**42 U.S.C. § 1983**
**(Against Chief Kunitzer, Individually)**

140. Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

141. At all relevant times, Chief Kunitzer acted under color of state law.

142. Chief Kunitzer was personally involved in the deprivation of Plaintiff's right to equal protection of the laws.

143. Chief Kunitzer had actual knowledge of the noose and of Plaintiff's complaint from in or about September 2025, and held the authority to investigate it, to discipline those responsible for it, and to address the District's workforce concerning it.

144. Chief Kunitzer refused Plaintiff's request that he acknowledge the noose to the District's workforce, while addressing that same workforce on other matters of workplace well-being.

145. Upon information and belief, Chief Kunitzer directed or approved the District's demand that Plaintiff, the Black complainant, submit to a law-enforcement polygraph as a "mandatory" condition of the investigation.

146. Chief Kunitzer personally closed the investigation on June 26, 2026, the day after receiving notice of Plaintiff's Charge, branded Plaintiff as uncooperative, conditioned any further investigation on Plaintiff's submission to police examination, and

communicated those decisions directly to Plaintiff in disregard of his request that communications be directed to counsel.

147. Upon information and belief, Chief Kunitzer failed to discipline Crawford, a member of the suspected crew, for abandoning an injured female colleague and disparaging her as a "DEI hire," and retained him in a senior training role.

148. Chief Kunitzer's response to the noose was so inadequate as to constitute deliberate indifference to, and tacit authorization of, the racially hostile work environment to which Plaintiff was subjected.

149. Upon information and belief, Chief Kunitzer would not have treated a similarly situated white employee who reported a racially or otherwise threatening display in this manner, and Chief Kunitzer acted with the intent to discriminate against Plaintiff because of his race.

150. The right of a public employee to be free from intentional race discrimination, including a racially hostile work environment knowingly tolerated by his supervisors, was clearly established at all relevant times. No reasonable fire chief could have believed it lawful to leave a noose displayed around the neck of a dark-skinned figure unacknowledged, to treat the Black firefighter who reported it as a suspect, and to close the investigation by blaming him.

151. Chief Kunitzer acted intentionally, maliciously, and with reckless and callous indifference to Plaintiff's federally protected rights, entitling Plaintiff to an award of punitive damages against him.

152. As a direct and proximate result of Chief Kunitzer's acts and omissions, Plaintiff has sustained the damages hereinabove alleged.

WHEREFORE, Plaintiff demands judgment against Defendants, jointly and severally to the extent permitted by law, and prays for relief as follows:

a. A declaratory judgment that Defendants' conduct violated Title VII and the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution;

b. Injunctive relief requiring the District to (i) issue a department-wide acknowledgment that the September 12, 2025 noose occurred and that such conduct will not be tolerated; (ii) adopt, publish, and enforce a written policy prohibiting racial harassment and retaliation, with procedures for reporting and investigating complaints; (iii) refrain from requiring employees who report harassment to submit to law-enforcement polygraph examinations as a condition of the investigation of their complaints; (iv) reopen and pursue in good faith its investigation of the noose; (v) remove from its records any characterization of Plaintiff as having failed to cooperate; and (vi) refrain from any further retaliation against Plaintiff;

c. Compensatory damages against the District on Counts I, II, and III, and against Chief Kunitzer on Count IV, for emotional distress, humiliation, and other injuries, in an amount to be determined at trial;

d. Punitive damages against Chief Kunitzer, in his individual capacity, on Count IV, in an amount to be determined at trial;

e. Back pay, lost benefits, and other economic losses, if any, proven at trial, together with such other equitable relief as is appropriate under 42 U.S.C. § 2000e-5(g);

f. Reasonable attorneys' fees, expert fees, and the costs and disbursements of this action pursuant to 42 U.S.C. §§ 1988 and 2000e-5(k);

g. Pre-judgment and post-judgment interest as allowed by law; and

h. Such other and further relief as the Court may find just and proper.

**DEMAND FOR JURY TRIAL**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury on each and every claim so triable.

Respectfully submitted,

**PARHAM LAW FIRM, LLC**

s/ William Shipp Daniel III, Esquire
William Shipp Daniel III (Fed. ID No. 14340)
541 W Evans Street
Florence, South Carolina 29591
Telephone: 843.407.7757
E-mail: shipp@parhamlawllc.com
*Local Counsel for Plaintiff Randy Brown*

Michael T. Ashley, Esquire
(*pro hac vice* application forthcoming)
**ASHLEY LAW, A LIMITED LIABILITY COMPANY**
Robert Treat Center
50 Park Place, Suite 1400
Newark, New Jersey 07102
Telephone: 973.623.0501
Facsimile: 973.623.0329
E-mail: ashleylaw@ashley-law.com
New Jersey Attorney ID No. 270032021
*Attorneys for Plaintiff Randy Brown*

Dated: Charleston, South Carolina
September 23, 2026